**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

**16-CR-103-V**

**-v-**

**ANTOINE EDWARDS,**

**Defendant.**

---

## REPORT, RECOMMENDATION, AND ORDER

This case was referred to the undersigned by the Hon. Lawrence J. Vilardo, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report on dispositive motions. Dkt. #12.

## PRELIMINARY STATEMENT

The defendant, Antoine Edwards ("the defendant"), is charged in an indictment with unlawful possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). Dkt. #11. Defendant has moved "to suppress any physical evidence and derivative evidence following the stop of his vehicle and arrest which occurred on or about July 10, 2016 in Buffalo, New York," Dkt. #18, p. 11, as well as "any statements made by the defendant subsequent to this arrest and detention." Dkt. #24, p. 3. On January 3, 2017, over the government's

objection, the undersigned conducted an evidentiary hearing, at which Buffalo Police Officers Paul Fitzpatrick and Trevor Sheehan testified. Dkt. #27. The parties thereafter filed post-hearing memorandums of law. Dkt. #s 28 & 31. For the following reasons, it is RECOMMENDED that defendant's motions to suppress (Dkt. #s 11 & 24) be DENIED.

## FACTS[1]

At 3:07 a.m. on July 9, 2016, the Buffalo Police Department ("BPD") received a 911 call from a woman reporting that a man outside her Camelot Court residence "fired a gun in the air and then fled." Tr. at 21, 24, 38.[2] Buffalo Police Officer Paul Fitzpatrick interviewed the caller at the scene. Tr. at 21-22. She reported that "her niece's boyfriend was outside arguing with her, pulled out a gun, fired in the air." Tr. at 22. She identified the man as Antione Edwards, gave his address as 109 Grider Street, and described him as having a medium height and build. Tr. at 22. Officer Fitzpatrick was familiar with Mr. Edwards through his "many dealings with him[, . . . n]umerous different calls, incidents." Tr. at 23.

Although the caller described Mr. Edwards' car as a Burgundy Lincoln, a records search revealed that the car registered to Mr. Edwards was in fact a Blue Nissan Maxima. Tr. at 23, 39-40. Several hours later, at 9:40 p.m. the evening of July 9, 2016, Officer Fitzpatrick was on routine patrol with another officer when he observed

---

[1] The following facts are taken from the transcript of the hearing conducted on January 3, 2017 (Dkt. #27), the "Post-Suppression Hearing Memorandum of Law by USA" (Dkt. # 28), and the "Memorandum in Support of Defendant's Motion to Suppress by Antoine Edwards" (Dkt. #31).

[2] "Tr." refers to the transcript of the January 3, 2017 suppression hearing.

defendant's car ("same license plate, same car") in defendant's driveway. Tr. at 24-25. A man Officer Fitzpatrick tentatively recognized as defendant entered the car and turned the lights on. Tr. at 24. At that juncture, the BPD had not apprehended a suspect or recovered the gun involved in the "shots fired" incident from the early morning. Tr. at 25. Officer Fitzpatrick "went down the street, pulled into a parking lot, and waited for the car to pull out." Tr. at 24.

Officer Fitzpatrick pulled over defendant's car and approached the driver's side. Tr. at 25. Another officer, Fitzpatrick's partner, approached the car at the passenger side. Tr. at 25. The defendant's girlfriend was in the passenger seat. Tr. at 26. Officer Fitzpatrick "asked [defendant] for his license, and what his name was." Tr. at 26. Officer Fitzpatrick recognized the driver as Antoine Edwards, which was confirmed when he produced his ID. Tr. at 26-27. When asked, the passenger identified herself as "Jacquelyn." Tr. at 26. At that point, Officer Fitzpatrick "knew it was the right people that were involved in the incident from the night before." Tr. at 26. Shining a flashlight in the car, Officer Fitzpatrick observed three open liquor bottles, a Solo cup, and a black Taser box in the center console of the car. Tr. at 26-27.

When other officers began to arrive at the scene, Officer Fitzpatrick noticed that defendant "started to get real nervous, looking around, and he started getting very suspicious." Tr. at 28. In particular, defendant was "putting his hand in between his legs in like a stuffing motion." Tr. at 28. After defendant made this "stuffing" motion twice, Officer Fitzpatrick asked him to put his hands on the wheel and

asked him, "Do you have anything on you? Is there anything in the car?" Tr. at 30. Defendant admitted that he had a Taser in his pocket. Tr. at 30.

Officer Fitzpatrick advised defendant that he was going to remove him from the vehicle. Tr. at 28. By Officer Fitzpatrick's estimate, there were now three officers on the driver's side and two officers on passenger side. Tr. at 30. According to Officer Fitzpatrick:

> I just opened the door. I think I just held on to [defendant's] hands and just kept them up so he couldn't reach for anything at the time, and then he turned around. I told him to turn around, put your hands on the car. We're going to walk to the back of the car. So he was still right at the open door. And I said we're going to walk to the back now, and tried walking him back and he tensed up and just held there. So we had to kind of physically move him down, put his hands behind his back, cuffed him up, and the Taser was removed.

Tr. at 31. The defendant was "facing the car, hands on the [top of the] car . . . right at the . . . open driver door," approximately 3 feet from the driver's seat. Tr. at 31-32. Jacqueline, the defendant's girlfriend, remained in the passenger seat, a "couple feet" from the driver's seat, not restrained in any way. Tr. at 33, 59.

Officer Fitzpatrick and another officer physically moved defendant to the back of the car. Tr. at 32. They patted defendant down, recovered the Taser from his pocket, and cuffed him. Tr. at 33. "Seconds" after cuffing the defendant, Officer Trevor Sheehan announced that he had recovered a gun. Tr. at 34, 36. Officer Fitzpatrick testified that the recovery of the gun may have happened simultaneous to defendant being cuffed. Tr. at 36. According to Officer Fitzpatrick, the gun was found inside of a

drawstring bag on top of the driver's seat "close to the central console" and "within arm's reach of the passenger." Tr. at 37, 46-47.[3] Inside the bag were powder cocaine, close to 100 pills, and .40 caliber pistol. Tr. at 37.

Officer Sheehan testified that he arrived on the scene shortly after defendant had been pulled over but before he was removed from his car. Tr. at 49. Other officers told Officer Sheehan about defendant's involvement in a "shots fired" incident early that morning. Tr. at 62. As such, Officer Sheehan "had reason to believe that the defendant had a gun." Tr. at 61. Officer Sheehan could see inside the vehicle using his flashlight and noted that defendant was "moving around, acting a little bit nervous" and "was trying to stuff something on his right side into the seat and underneath his leg." Tr. at 50. After defendant was removed from the vehicle, Officer Sheehan testified that the black drawstring bag was in "clear view," as follows:

> After the defendant was moved by the officers to the rear of the vehicle, I observed a large black bag on the driver's seat that I believed the defendant was attempting to stuff, because it was a little partially tucked into the seat, but it was still on top of the driver's seat.

Tr. at 52. Officer Sheehan described the bag as a larger drawstring bag, approximately 8 to 9 inches wide. Tr. at 53. Officer Sheehan picked up the bag, which was made of thin material and which was not tightly closed, and could "[c]learly feel that there was a weapon, that it was a gun." Tr. at 54. "At that point, I called out to my partners that there was a gun in the vehicle." Tr. at 55. To Officer Sheehan's recollection, defendant had been moved to the rear of the vehicle but had not yet been handcuffed when he found the gun. Tr. at 56. After recovering the bag, Officer Sheehan "immediately took it

---

[3] Officer Fitzpatrick initially testified that the drawstring bag was discovered on the passenger seat but later clarified that it was found on the driver's seat. Tr. at 37, 46-47.

to [his] patrol vehicle to secure it." Tr. at 55. At that point, he "opened the bag and saw that there was loaded gun, as well as multiple narcotics." Tr. at 55.

## DISCUSSION AND ANALYSIS

### An Evidentiary Hearing was Warranted

An evidentiary hearing on a motion to suppress "ordinarily is required if the moving papers are sufficiently definite, specific, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir.1992) (citations and quotations omitted). A defendant seeking to suppress evidence bears the burden of showing that disputed issues of material fact exist. *See Pena*, 961 F.2d at 338. At the same time, "District Courts have broad discretion when deciding whether or not to hold a suppression hearing." *United States v. Shamsideen*, No. 03 CR.1313(SCR), 2004 WL 1179305, at *9 (S.D.N.Y. Mar. 31, 2004). This includes the "discretion to grant an evidentiary hearing; even where the defendant's allegations are general and conclusory." *Id.*

In support of his motion to suppress, defendant submitted an affidavit stating that he did not violate any Vehicle and Traffic Law, and that he was "aware of no probable cause" to stop and search his car, the bag therein, or his person. Dkt. #25. Although defendant's affidavit does not dispute that he was the subject of a "shots fired" call earlier in the day, the prosecutor herself stated that more than 17 hours had

elapsed between the time of the 911 call and when defendant was pulled over in his car, a very substantial period of time. Dkt. #27, p. 8. The question was also raised as to where defendant was in relation to the car after he was removed and the gun recovered. Dkt. #27, pp. 10-11. These factual issues bear on whether the officers were justified in stopping and searching the vehicle. Under the circumstances, a hearing was warranted to resolve those factual issues.

***Terry* Stop of Defendant's Vehicle**

A police officer may briefly detain an individual and, if necessary, perform a pat down search for weapons provided that the officer has "reasonable suspicion, based on specific and articulable facts," *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994), "that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). *Terry*'s reasonable suspicion standard is decidedly less demanding than the probable cause standard needed to conduct a warrantless search. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (recognizing that reasonable suspicion, while requiring at least a minimal level of objective justification for making the stop, requires less of a showing than probable cause); *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (holding that probable cause means "a fair probability that contraband or evidence of a crime will be found" and "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause") (internal citations omitted). A pat frisk search that is supported by reasonable suspicion "is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken." *Terry*, 392 U.S. at 30-31.

An officer's authority to "stop and frisk" extends to individuals in a moving vehicle. *See United States v. Hensley*, 469 U.S. 221, 226 (1985) (recognizing that "law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity"); *United States v. Lucky*, 569 F.3d 101, 106 (2d Cir. 2009) (holding that if police have a reasonable and articulable suspicion, they may briefly stop someone and this authority includes the right to pull over a moving vehicle). "Although stopping a car and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from intrusion." *Hensley*, 469 U.S. at 226.

In deciding whether a *Terry* stop is reasonable under the Fourth Amendment, a reviewing court must determine, first, "whether the officer's action was justified at its inception, and [second], whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Bayless*, 201 F.3d 116, 132-133 (2d Cir. 2000) (citing *Terry*, 392 U.S. at 20). This assessment is made considering "the totality of the circumstances" surrounding the stop. *Sokolow*, 490 U.S. at 8.

This Court finds that Officer Fitzpatrick had reasonable suspicion to pull defendant's car over based on the early morning "shots fired" report in which the caller,

who knew defendant personally, identified defendant by name, gave a physical description, and provided his address. In this regard, her report that defendant had fired a gun bore sufficient "indicia of reliability" to support reasonable suspicion that he was armed. *Adams v. Williams*, 407 U.S. 143, 147 (1972). Of significance, the caller was not anonymous. She provided her name, witnessed the events first-hand, and confirmed her report to Officer Fitzpatrick in person immediately following the incident. Where, as here, "an informant is partially known . . . , a lesser degree of corroboration may be sufficient to establish reasonable suspicion." *United States v. Elmore*, 482 F.3d 172, 181 (2d Cir. 2007). Private citizen informants – as compared with paid or criminal informants – are generally presumed to be telling the truth absent circumstances suggesting that they should not be trusted. *Elmore*, 482 F.3d at 180 (citing *Caldarola v. Calabrese*, 298 F.3d 156, 165-66 (2d Cir. 2002) and *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975)). Moreover, a citizen informant who meets with the police face-to-face is considered more reliable because he or she runs a greater risk of being held accountable if the information provided proves false. *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir.1991).

That the caller was mistaken about what kind of car defendant was driving does not undermine the otherwise accurate information that she provided to the police. This is especially true since defendant was known to Officer Fitzpatrick, and the BPD confirmed the make, model, and license plate of defendant's vehicle through dispatch, confirmed his address, and observed him (albeit tentatively) getting into that very car at that very address. Under the totality of the circumstances, Officer Fitzpatrick acted

reasonably in stopping defendant's vehicle to determine if he was still armed with the weapon that he reportedly discharged in the early morning. This initial detention was justified by reasonable suspicion that defendant was committing or had committed a crime and was possibly armed.

**The Search of Defendant's Car and Person Incident to His Arrest**

"A police officer ordinarily has probable cause to arrest when he or she 'ha[s] knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" *United States v. Diaz*, 854 F.3d 197, 203 (2d Cir. 2017) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). Officer Fitzpatrick's probable cause determination was clearly justified by what he determined after pulling defendant's car over. That is, Officer Fitzpatrick confirmed that the driver was in fact, Antione Edwards, the alleged shooter from the earlier "shots fired" incident. Moreover, defendant was driving with open containers of alcohol in the vehicle, and he admitted to having a taser. In this respect, defendant was in violation of numerous New York Penal and Vehicle and Traffic Laws, any one of which would justify his arrest. *See* N.Y. PENAL LAW § 265.02 (Criminal Possession of a Weapon in the Third Degree) (at a minimum); N.Y. PENAL LAW § 265.01 (Criminal Possession of a Weapon in the Fourth Degree); N.Y. VEH. & TRAF. LAW § 1227 (Consumption or Possession of Alcoholic Beverages in Certain Motor Vehicles).

"The search-incident-to-arrest doctrine is an exception to the general requirement that an officer must obtain a judicial warrant supported by probable cause before conducting a search." *Diaz*, 854 F.3d at 205 (citing *Riley v. California*, ___ U.S. ___, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014)). This doctrine serves two important interests: "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Arizona v. Gant*, 556 U.S. 332, 339 (2009). These interests "are assumed to be present whenever an officer is justified in making an arrest." *Diaz*, 854 F.3d at 205; *Riley*, 134 S.Ct. at 2483. Whether the search occurs before or after the arrest is of no import, *see Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980), "so long as it is 'substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest.'" *Diaz*, 854 F.3d at 205 (citing *Shipley v. California*, 395 U.S. 818, 819 (1969)).

Under *Gant*, a vehicle may be searched incident to a driver suspect's arrest when the suspect has access to the vehicle **or** when there is a likelihood of discovering offense-related evidence. *Gant*, 556 U.S. at 344. The area that may be searched is generally restricted to the area within which a suspect can reach for a weapon or destroy evidence. *Chimel v. California*, 395 U.S. 752, 763 (1969). This includes the passenger area of a vehicle and any containers in that area. *United States v. Harwood*, 998 F.2d 91, 97 (2d Cir. 1993). The exception also extends to circumstances where the suspect has recently emerged from the car. *Thornton v. United States*, 541 U.S. 615, 623-24 (2004).

Based on the testimony offered at the suppression hearing, Officers Fitzpatrick and Sheehan were clearly justified in searching defendant's person, the driver's seat, and the drawstring bag on that seat. The officers had probable cause to arrest defendant on numerous grounds and knew based on statements made by defendant himself that he was armed with a taser. Based on the earlier "shots fired" call, they were also aware that defendant was likely in possession of a handgun as well. Although Officer Sheehan was not personally involved in the prior "shots fired" incident, other officers advised him of the 911 report that defendant had fired a gun in the air that morning. Under the circumstances, Officer Sheehan was entitled to rely on the report from his fellow officers that defendant was allegedly involved in a gun crime some hours earlier. *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) (recognizing "where law enforcement authorities are cooperating in an investigation . . . , the knowledge of one is presumed shared by all") (internal citations omitted).

Both officers testified that defendant was outside the open driver door facing into the vehicle when they began the search of his person. According to the unrefuted testimony, the gun was found on the driver's seat simultaneous to or within seconds of defendant being moved to the rear driver's side of the car and being handcuffed. Under these circumstances, Officer Sheehan was legally justified in searching the driver's area and the bag to ensure the officers' safety. Even if defendant had not been within reach of the bag, the officers had seen the open containers in the car, and had seen defendant nervously "stuffing" something under his legs in an apparent effort to hide something. Tr. at 28, 50. Therefore, the officers were justified in

searching the car for offense-related evidence. *Gant*, 556 U.S. at 344. These dual justifications are further supported by the presence of defendant's girlfriend, who was completely unrestrained in the passenger seat and within arm's reach of the gun and the evidence.

Officer Sheehan's search of the drawstring bag was also lawful under the "plain feel" doctrine. "The 'plain feel' doctrine is a variation of the 'plain view' doctrine that provides that law enforcement 'may lawfully seize evidence they touch and can plainly feel is contraband or contains contraband.'" *United States v. Rivera*, 89 F. Supp. 3d 376, 392 (E.D.N.Y. 2015) (internal citations omitted); s*ee also United States v. Ocampo,* 650 F.2d 421, 429 (2d Cir.1981) (holding that search of brown bag where law enforcement agents could plainly feel that the bag contained currency was lawful). Officer Sheehan testified that upon touching the bag, which was made of thin fabric, it was immediately apparent that it contained a gun. As such, it was reasonable for the officer to seize the bag and remove the contraband inside it.

Further undermining defendant's motion to suppress is that the officers could have seized the car and searched it later. *Chambers v. Maroney*, 399 U.S. 42, 52 (1970) (holding that where officers had probable cause to stop an automobile and search it for guns and stolen money, the subsequent search of the automobile at the station house without a warrant was proper). Where police have probable cause to believe a car stopped on the road contains contraband, "the justification to conduct a

warrantless search does not vanish once the car ha[s] been immobilized." *Michigan v. Thomas*, 458 U.S. 259, 261 (1982); *see also Florida v. Meyers*, 466 U.S. 380, 382 (1984) (finding that the warrantless search of an automobile which was impounded and in police custody, conducted approximately eight hours after concededly valid initial search conducted at time of defendant's arrest, was proper). In this regard, it was inevitable that the police would have discovered the gun and drugs inside defendant's car.

It is unclear from the papers whether defendant still seeks to suppress defendant's post arrest statements as the fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963). Dkt. #28, p. 2, n. 1. However, because the officers were legally justified in pulling defendant over and searching his person and his car, there is no basis to suppress defendant's post-arrest statements.

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's Motions to Suppress (Dkt. Nos. 18 & 24) be DENIED.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation, and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b)(2) and Local Rule 72. **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72 of the Local Rules for the Western District of New York, "written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection, and shall be supported by legal authority." **Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection.**

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988). In accordance with the requirements set forth in Local Rule 72, "[a]ny party filing objections to a Magistrate Judge's order or recommended disposition must include with the objections to the District Judge a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge."

**SO ORDERED.**

DATED: Buffalo, New York
May 26, 2017

***s/ H. Kenneth Schroeder, Jr.***
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**